**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **LYNDA MICHELLE NORRIS,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.  3:15-CV-3634-BH** |
| | § | |
| **NANCY A. BERRYHILL, ACTING,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | |

**MEMORANDUM OPINION AND ORDER**

Pursuant to the consent of the parties and the order of reassignment dated April 26, 2016, this case has been transferred for the conduct of all further proceedings and the entry of judgment.  (doc. 17.)  Before the Court is *Plaintiff's Brief*, filed March 20, 2016 (doc. 13), *Defendant's Brief*, filed May 19, 2016 (doc. 20), and *Plaintiff's Reply Brief*, filed June 9, 2016 (doc. 24).[1]  Based on the relevant findings, evidence, and applicable law, the Commissioner's decision is **AFFIRMED**.

**I.   BACKGROUND**[2]

**A.   Procedural History**

Lynda M. Norris (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner)[3] denying her claim for disability insurance benefits (DIB) under Title II and supplemental security income (SSI) under Title XVI of the Social Security Act.  On

---

[1]  On June 8, 2016, Plaintiff also filed *Plaintiff's Reply Brief* (doc. 23), which appears the same as her reply brief filed on June 9, 2016.  (*See* docs. 23, 24.)

[2]  The background information comes from the transcript of the administrative proceedings, which is designated as "R."

[3]  At the time of the initial filing of this appeal, Carolyn W. Colvin was the Acting Commissioner of the Social Security Administration, but she was succeeded by Nancy A. Berryhill beginning January 20, 2017.

January 23, 2012,[4] she applied for DIB and SSI, alleging disability beginning on December 10, 2011.  (R. at 128-45.)  Her claim was initially denied on April 18, 2012, and upon reconsideration on June 6, 2012.  (R. at 77-82, 89-92.)  On August 2, 2012, she requested a hearing before an administrative law judge (ALJ).  (R. at 95-98.)  She appeared and testified at a hearing on April 22, 2014.  (R. at35-64.)  On July 25, 2014, the ALJ issued his decision finding Plaintiff not disabled. (R. at 18-29.)  Plaintiff timely appealed the ALJ's decision to the Appeals Council.  (R. at 12-13.) The Appeals Council denied her request for review, and the ALJ's decision became the final decision of the Commissioner.  (R. at 1-5.)  Plaintiff timely appealed the Appeals Council's decision under 42 U.S.C. § 405(g).

**B.**   **Factual History**

   **1.**      **Age, Education, and Work Experience**

Plaintiff was born on May 2, 1968, and was 45 years old at the time of the hearing on April 22, 2014.  (R. at 39.)  She had two years of junior college, and had previously worked as a sales person/hardware (279.357-050, light, semi-skilled, SVP: 4), warehouse worker (922.687-058, medium, unskilled, SVP: 2), and merchandise clerk (299.367-014, heavy, semi-skilled, SVP: 4). (R. at 27, 39.)

   **2.**      **Medical Evidence**

Plaintiff was admitted to Baylor University Medical Center (Baylor) on October 14, 2009, after the "sudden onset of the worse headache of her life."  (R. at 405.)  A head CT demonstrated a subarachnoid hemorrhage, and a CT angiogram demonstrated a basilar tip cerebral aneurysm.  (*Id.*) Plaintiff underwent coiling of the basilar tip aneurysm.  (*Id.*)  The surgery was "uneventful," and a

---

[4]   The ALJ stated in his decision and at the hearing that Plaintiff filed her applications on January 20, 2012, but the applications appear to be dated January 23, 2012.  (*See* R. at 18, 37, 128-45.)

2

"[s]erial CT demonstrated progressive resolution of the subarachnoid hemorrhage." (*Id.*) She progressively improved and was discharged on October 23, 2009. (*Id.*)

On January 27, 2010,[5] Plaintiff met with Waleed H. El-Feky, M.D., at Texas Neurology, P.A. (Texas Neurology), for a follow up. (R. at 362.) Plaintiff reported to Dr. El-Feky that on October 13, 2009, she had the "worse headache of [her] life" and was taken to Baylor. (*Id.*) She was found to have a subarachnoid hemorrhage and ruptured basilar tip aneurysm and underwent a coiling. (*Id.*) Plaintiff denied any significant symptoms following the coiling, and Dr. El-Feky noted that she was awake, alert, and oriented with normal language, memory, and attention. (R. at 362-63.)

Plaintiff had a CT of her head on February 8, 2010, at Baylor. (R. at 360.) William Taylor, M.D., found no evidence of acute intracranial abnormality on the CT, which redemonstrated a previously visualized large coil pack in the region of the basilar tip. (*Id.*)

Plaintiff had a follow up with Dr. El-Feky at Texas Neurology on March 26, 2010. (R. at 357.) He noted that Plaintiff was asymptomatic but had "some anxiety" and suffered from a panic attack approximately once a month. (*Id.*) On March 9, 2011, Plaintiff returned to Texas Neurology because she was worried about her past basilar aneurysm coiling. (R. at 235.) She also complained that her skin tingled all over. (*Id.*) Quanetta L. Davis, PA-C, under the supervision of Dr. El-Feky, noted that Plaintiff had "no new symptoms but would like to review her pictures of her brain for reassurance." (*Id.*) Ms. Davis noted that the reports showed she was stable. (R. at 236.)

On August 5, 2011, and September 23, 2011, Plaintiff met with Scott Farley, D.O., at Comprehensive Spine Center of Dallas. (R. at 283-290.) Dr. Farley assessed low back pain and lumbar radiculopathy. (R. at 286, 290.) He continued her use of Norco for pain, referred her to

---

[5] Plaintiff's New Patient Packet questionnaire was dated January 22, 2010, but it is unclear whether she had an appointment on that day. (*See* R. at 365-68.)

physical therapy, and encouraged use of a back brace.  (R. at 286.)

On August 19, 2011, an MRI of Plaintiff's lumbar spine without contrast was performed. (R. at 247.)  The test found a 3- to 4-mm far left posterolateral disc herniation with moderate, associated left neutral foraminal stenosis distally at L4-L5 and a 2- to 3-mm central disc protrusion with annular tear at L5-S1.  (*Id.*)

On October 5, 2011, Plaintiff presented at Cardinal Pain Center with a chief complaint of low back and leg pain.  (R. at 277, 279.)  She met with Vijay Arvind, M.D., who noted that Plaintiff was obese and in distress secondary to pain.  (R. at 279.)  He diagnosed her with lumbar radiculopathy, myofascial pain, and lumbar spondylosis.  (R. at 281.)

Plaintiff had an MRI/MRA brain examination of the head on November 7, 2011.  (R. at 240.) She returned to Texas Neurology on November 10, 2011, for a routine follow up and to review her MRI/MRA brain results.  (R. at 238.)  Ky Yarborough, PA-C, under the supervision of Alan W. Martin, M.D., noted that her repeat MRI brain with intracranial MRA demonstrated a stable, coiled, aneurysm, and that Plaintiff reported she was "doing well" but had "occasional" headaches.  (*Id.*) Her physical exam was within normal limits.  (*See id.*)

On January 24, 2012, Plaintiff returned to Cardinal Pain Center and again met with Dr. Arvind.  (R. at 274-75.)  She again complained of back pain.  (R. at 275.)  Plaintiff reported that she quit her job because she was unable to keep up with eight to 12-hour shifts as a result of "horrible pain" going down her left leg.  (R. at 275.)  An MRI showed left L4 and L5 nerve root stenosis due to disc herniation and an annular fissure at L5-S1.  (*Id.*)  A physical exam, which included a mental status exam, was within normal limits, and Plaintiff was assessed with lumbar radiculopathy, lumbar herniated nucleus pulposus, and lumbar degenerative disc disease.  (R. at 275-76.)

4

On February 3, 2012, Plaintiff returned to Texas Neurology because of her headaches and met with Ms. Yarborough.  (R. at 347)  She reported daily headaches with photophobia, phonophobia, nausea, and subjective memory loss of unclear etiology.  (R. at 348.)  Plaintiff was started on Medrol and Amerge for her headaches.  (*Id.*)  Dr. Martin signed off on Ms. Yarborough's notes.  (R. at 349.)

On March 24, 2012, Plaintiff attended a consultative psychiatric examination with Peter Holm, M.D.  (R. at 292-95.)  She identified her chief complaint as anxiety and reported that she had noticed a decline in her cognitive function since about one year after her aneurysm repair.  (R. at 292.)  Plaintiff also reported that she had not been employed full-time since January 2012 because of her cognitive problems, but that she successfully had a one-day assignment the day before her appointment.  (*See id.*)  She also reported that her eyes had been very light sensitive for the prior six months, and that she experienced "some occasional headaches."  (*Id.*)  Dr. Holm noted that Plaintiff had been treated with Ambien and Ativan, which had helped with her sleep and her anxiety over her perceived cognitive problems.  (*Id.*)  She denied any interactional problems with people but felt very easily overwhelmed by tasks.  (R. at 293.)  He diagnosed an amnestic disorder not otherwise specified and assigned a global assessment of function (GAF) of 45.  (R. at 294-95.)

On April 17, 2012, state agency medical consultant (SAMC) Susan Thompson, M.D., completed a Psychiatric Review Technique for Plaintiff.  (R. at 296-308.)  She noted Plaintiff had an amnestic disorder and found that she was moderately limited in maintaining social functioning and maintaining concentration, persistence, and pace.  (R. at 299, 306.)  Dr. Thompson also found that Plaintiff was mildly restricted in activities of daily living and had no episodes of decompensation.  (R. at 306.)  Dr. Thompson opined that Plaintiff's allegations were "partially

supported." (R. at 308.)

Dr. Thompson completed a Mental Residual Functional Capacity Assessment. (R. at 318-21.) She determined that Plaintiff was moderately limited in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday and workweek without interruptions from psychologically based symptoms and perform a consistent pace without an unreasonable number and length of rest periods, and accept instructions and respond appropriately to criticism from supervisors. (R. at 318-19.) She could understand, remember, and carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in routine work setting. (R. at 320.)

SAMC James Wright, M.D., completed a Physical Residual Functional Capacity Assessment for Plaintiff on April 17, 2012. (R. at 310-17.) Dr. Wright opined that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for a total of six hours in an eight-hour workday, sit for a total of six hours in an eight-hour workday, and push and/or pull without limitations. (R. at 311.) He further opined that she could also occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but she could never climb ladders, ropes, or scaffolds. (R. at 312.) Dr. Wright also opined that Plaintiff's allegations were "partially supported." (R. at 317.)

Progress notes from Dr. Martin at Texas Neurology for April 18, 2012, show that Plaintiff complained of persistent anxiety and intermittent panic attacks but benefitted from Ativan. (R. at 325-27, 344-46.) She reported frequent headaches that responded to Tramadol, and exercise helped her anxiety symptoms. (*Id.*) She complained of cognitive and memory symptoms when she was

anxious.  (*Id.*)  A physical examination was within normal limits.  (R. at 325-26.)  Plaintiff was assessed as having an aneurysm of other specified artery, a generalized anxiety disorder, and migraines, unspecified without mention of intractable migraine.  (R. at 326.)  She was prescribed Hydrocodone as needed for the headaches and Buspar for the underlying anxiety.  (*Id.*)

On June 4, 2012, Veena Ghai, M.D., affirmed Dr. Thompson's mental RFC assessment for Plaintiff.  (R. at 329.)  Likewise, Laurence Ligon, M.D., affirmed Dr. Wright's physical RFC assessment on June 5, 2012.  (R. at 330.)

On August 16, 2012, Plaintiff had a MRA intracranial exam, which showed the previously identified filling of the neck of the coiled basilar tip aneurysm; the configuration of the residual neck filling appeared unchanged and "stable."  (R. at 342.)

On August 16, 2012, Plaintiff presented at Texas Neurology because of eye pain.  (R. at 339.)  Ms. Yarborough and Dr. Martin recommended that she consult with an ophthalmologist if the pain was not resolved by her headache treatment.  (R. at 340.)

On January 13, 2013, Plaintiff went to Baylor's emergency room with a complaint of headaches and a toothache as a result of broken teeth.  (R. at 400.)  A CT of the head without contrast was performed, and she was discharged in stable condition the same day.  (R. at 401, 403.)  The scan showed no evidence of acute intracranial process and a stable appearance of aneurysm coil pack at the basilar tip.  (R. at 403.)  The doctors diagnosed Plaintiff with acute pain in mandible dental caries, acute pain in maxilla dental caries, and headaches.  (R. at 400-01.)

On April 5, 2013, an MRI of Plaintiff's lumbar spine revealed left foraminal broad-based disc protrusion at L4-L5 level causing moderate to severe left neural foramen narrowing, and small central disc protrusion at the L5-S1 level without significant canal or foraminal narrowing.  (R. at

503-07.)

On August 18, 2013, Plaintiff went to Baylor's emergency room with a complaint of blisters on her tongue.  (R. at 397.)  She reported having smoked for 33 years, but she quit in 2009.  (*Id.*)  The doctors diagnosed her with stomatitis.  (R. at 399.)  Plaintiff was discharged the same day to see a dentist and/or an oral maxillofacial surgeon.  (*Id.*)

On September 6, 2013, Dr. Martin completed a one-page form that diagnosed Plaintiff with an aneurysm, depression, and anxiety.  (R. at 331.)  He opined that she was unable to work but that her disability was not permanent and that she "needs to be released by psychiatrist to resume work." (*Id.*)  On June 19, 2013, Plaintiff had a MR brain and MR angiographic examination of the head and met with Dr. Martin, who noted that her MRI and MRA appeared stable.  (R. at 333-38.)

On September 20, 2013, Plaintiff went to Baylor's emergency room because she felt unsafe at home alone as a result of increasing depression, which she attributed to her prior aneurysm and to her husband having left her that day.  (R. at 392.)  She was diagnosed with depression, suicidal ideation (resolved), and elevated blood sugar, and was discharged the same day.  (R. at 392-96.)

On September 21, 2013, Plaintiff went to Timberlawn Mental Health System (Timberlawn) because of her depression.  (R. at 437.)  She met with people at Timberlawn from September 21, 2013, through February 27, 2014.  (*See* R. at 430-44.)

Plaintiff had an MRA of the head on November 25, 2013, which demonstrated sequela of prior endovascular coiling of a basilar apex aneurysm with small focus of residual filling at the neck of the aneurysm, stable compared to multiple prior studies, and "otherwise unremarkable intracranial arterial vasculature."  (R. at 428.)

From March 13, 2013 to November 6, 2013, Plaintiff went to Phoenix Pain Clinic for her

back pain and headaches. (R. at 479-97.) Jose Duarte, M.D., repeatedly noted that her medications were "good enough for function," but that she still had some pain. (R. at 479, 481, 484, 487, 489, 491, 493.) He also noted that Ultram helped with her headaches. (*Id.*)

On December 14, 2013, Plaintiff went to Baylor's emergency room with a complaint of headaches, anxiety, and pain to her posterior scalp, which had begun the day before. (R. at 388.) She described the headaches as intermittent and sharp, but "[a]t its worst the pain was moderate." (*Id.*) It was accompanied by nausea, vertigo, and tingling on the right arm, and was aggravated by light and noise. (*Id.*) She reported that she had experienced chronic headaches several times a month since she had a cerebral aneurysm. (*Id.*) The doctors diagnosed Plaintiff with acute headaches and anxiety. (R. at 388, 391.) Her neurological exam was normal. (R. at 390.) She felt better after she was given medication and was discharged the same day. (R. at 390-91.)

A lumbar spine MRI was completed on February 27, 2014. (R. at 524.) It revealed moderate-sized left foramial disc herniating at L4-L5 level, which caused moderate to severe left neural foraminal stenosis with likely indentation/compression of the exiting left L4 nerve root and mild spondylotic changes at L5-S1 level without significant canal or foraminal narrowing. (*Id.*)

Between February 26, 2014, and April 22, 2014, Plaintiff went to Pain Diagnostic and Treatment Center, P.A., for her low back pain, and met with Timothey N. Zoys, M.D. (R. at 516-28.) On March 5, 2014, Plaintiff followed up with Dr. Zoys. (R. at 522.) She reported that she felt worse and described her pain as "aching, sore," ranging from 8/10 to 10/10. (R. at 522.) A physical and mental examination was within the normal limits. (*See id.*) He assessed her as having displacement of lumbar intervertebral disc without myelopathy, lumbosacral radiculitis not otherwise specified, and spinal stenosis of lumbar region. (*Id.*) An epidural steroid injection was

9

recommended, but Plaintiff held off because of financial issues.  (R. at 517, 523.)  Dr. Zoys repeatedly noted that her response to the injection would determine whether further referral to a comprehensive interdisciplinary pain management program was warranted.  (R. at 516-17, 519, 521.)  When Plaintiff was seen again on April 16, 2014, it was noted the percentage of functional benefit and the percentage of pain relief with Norco treatment was 65-70 percent, and that she reported no side effects to the medication.  (R. at 518.)

On April 21, 2014 Khurshid Khan, M.D., completed a Medical Assessment of Ability to Do Work-Related Activities (Physical) for Plaintiff.  (R. at 512-14.)  Dr. Khan opined that her ability to lift/carry was not affected by her impairment.  (R. at 512.)  He also noted that she had two herniated discs in her lower back, and that her ability to stand/walk and sit was affected by impairment, which caused her to have "severe pain" when she stood or walked for more than 10 minutes.  (*Id.*)  Additionally, when Plaintiff sat for longer durations of time, she experienced compression on a nerve.  (R. at 513.)  He opined that she could sit for 20 minutes total in an eight-hour workday and 20 minutes without interruption.  (*Id.*)  She could occasionally climb, stoop, kneel, and balance but never crouch nor crawl because of her herniated discs.  (*Id.*)  Dr. Khan also opined that Plaintiff would not be a reliable worker due to her memory issues and her limited dexterity and range of motion.  (R. at 513-14.)

### 3.    Hearing Testimony

On April 22, 2014, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ.[6] (R. at 35-64.)  Plaintiff was represented by an attorney.  (R. at 37.)

---

[6]  Plaintiff's hearing was initially set for October 24, 2013, but the ALJ reset the hearing so she could obtain representation.  (R. at 65-70.)

### a.       *Plaintiff's Testimony*

Plaintiff testified that she was 45 years old, right handed, 5' 4" tall, and weighed 180 pounds. (R. at 39.)  She was common-law married and had attended two years of junior college.[7]  (*Id.*)

Plaintiff alleged that she became disabled in December 2011, which was the last time she worked full time, as a result of an aneurysm.  (R. at 43.)  From 2007 to December 2011, Plaintiff maintained the video game sections in several stores, including Office Max, Circuit City, Walmart, and Best Buy.  (R. at 42.)  She replaced old video systems with new ones and handled "resets," which included taking everything out of sections and replacing those sections with new shelving, new products, and new tags.  (R. at 42-43.)  After her aneurysm in 2009, Plaintiff began to suffer from headaches three to four time a week.  (R. at 45.)

Plaintiff described her headaches as lasting one to two hours after she took her medication, and she would "seclude" herself in her bedroom without any light until they passed.  (R. at 45-46.) Without her medication, her headaches persisted.  (R. at 46.)  She also suffered from diabetes and "extreme" anxiety, which she did not have prior to her aneurysm. (*Id.*)  Plaintiff related her anxiety to a fear of dying because of her aneurysm.  (*See* R. at 47.)  She took Xanax, Klonopin, and Tramadol.  (R. at 45-46.)

Plaintiff started experiencing back pain in May 2011 after a "twist" and was diagnosed with two herniated discs.  (R. at 43-44.)  The pain caused her to stay in bed for several days at a time. (*Id.*)  She had problems with her back throughout the day on a daily basis when she turned into certain positions, or when she tried to pick up something.  (R. at 43-45.)  When that occurred, she felt "extreme pain" that shot down her legs.  (R. at 45.)  After her aneurysm, Plaintiff also noticed

---

[7]  In her application for SSI, Plaintiff stated that she never married, but that her household consisted of her son and her "boyfriend," who appeared to be her son's father.  (*See* R. at 137-38.)  She testified at the hearing that she and her "husband" had been "common law married" since they were 18 and 20 years old.  (R. at 39.)

a slowing of her mental capacities, and she decided to "gracefully bow out of being able to work full time." (R. at 43-44.)

In 2012, Plaintiff worked as a part-time merchandiser for five to 20 hours a week in the greeting card sections of Family Dollar and Dollar General stores. (R. at 40.) She would go in and remove outdated cards and stock the most recent or holiday-appropriate cards. (*Id.*) That position was for a fixed duration and lasted for approximately two months. (*Id.*) She again worked as a merchandiser at Family Dollar and Dollar General stores from October 2012 to May 2013. (R. at 41.) She had trouble focusing, suffered from short-term memory loss, and got lost leaving stores. (*Id.*) Her mental capacity "deteriorat[ed] at a fast rate." (*Id.*) For example, when leaving stores, she forgot where she was and had to call her husband for directions to her home. (*Id.*) In March 2013, Plaintiff began to have problems completing her tasks at work. (R. at 48.)

In response to a question related to her "biggest problem" with working eight hours a day, Plaintiff responded, "[t]he fear of the anxiety attacks; the pain that comes in my lower back; and the headaches that come unexpectedly; just everything, all of the symptoms that I seem to have developed from having the aneurysm, tells me I can't do it anymore." (R. at 48-49.) She further explained that she was unable to work because her anxiety and back problem continued to get worse. (R. at 54.) Additionally, she could only stand and walk for ten minutes at a time, could only sit for 20 minutes out of an eight-hour workday, had a "little bit" of trouble getting along with people, and suffered from short-term memory issues. (R. at 56-58.)

### b.    VE's Testimony

The VE testified that Plaintiff had past work as a sales person/hardware (279.357-050, light, semi-skilled, SVP: 4), warehouse worker (922.687-058, medium, unskilled, SVP: 2), and

merchandise clerk (299.367-014, heavy, semi-skilled, SVP: 4).  (R. at 59.)  The VE noted that Plaintiff indicated that she practiced sales/hardware and merchandise clerk at a heavy exertional level, but that based on her education and experience, the positions were typically practiced at medium and light-to-medium levels, respectively.  (*Id.*)

The ALJ asked the VE to consider a hypothetical person of the same age, education, and work background as Plaintiff, who had at least moderate difficulties in concentration, persistence, and pace, such that she was limited to simple, routine, repetitive tasks that were consistent with unskilled work that was learned by rote, and simple instructions and simple work-related decisions. (R. at 60.)  Additionally, the hypothetical person was limited to few work place changes, little judgment, and simple and direct supervision and would have at least moderate difficulties in social functioning.  (*Id.*)  She could have no more than occasional contact with the general public and coworkers.  (*Id.*)  The hypothetical person was limited to light work, occasional lifting and carrying 20 pounds, frequently lifting and carrying 10 pounds, standing and walking with normal breaks for about six hours in an eight-hour workday, sitting with normal breaks for about six hours in an eight-hour workday.  (*Id.*)  She had no limitations with regard to pushing, pulling, or operation of hand and foot controls, and she was able to occasionally climb ramps and stairs, balance, stoop, kneel, and crouch.  (*Id.*)  The hypothetical person could not climb ladders, ropes, or scaffolds, and she was required to avoid even moderate exposure to hazards, moving machinery or unprotected heights, and commercial driving.  (*Id.*)

The ALJ then asked the VE whether the hypothetical person could engage in any of Plaintiff's past work, and the VE said she could not.  (*Id.*)  The VE opined that the hypothetical person could work as a laundry worker (302.685-010, light, unskilled, SVP: 2) with 123,600 in the

national economy and 10,500 in Texas; a ticketer (229.587-018, light, unskilled, SVP: 2) with 213,000 in the national economy and 16,200 in Texas; and a mail clerk (209.687-026, light, unskilled, SVP: 2) with 70,000 in the national economy and 4,500 in Texas.  (R. at 61.)  Her testimony was consistent with the Dictionary of Occupational Titles (DOT).  (*Id.*)

The ALJ asked the VE to next assume the hypothetical person could lift and carry less than 10 pounds, stand and walk for less than one hour in an eight-hour workday, and sit for less than two hours in an eight-hour workday.  (*Id.*)  The ALJ then asked whether the hypothetical person could perform any of the previously described jobs or any other full-time competitive employment.  (*Id.*)  The VE opined that the hypothetical person could not.  (*Id.*)  It would be difficult for the hypothetical person to maintain competitive employment if she was not at her work station at least 90 percent of the time, or if she missed two or more days per month.  (R. at 62.)

### C.    The ALJ's Findings

The ALJ issued his decision denying benefits on July 25, 2014.  (R. at 18-29.)  At step one,[8] he found that Plaintiff had not engaged in substantial gainful activity since December 10, 2011, the alleged onset date.  (R. at 20.)  At step two, he found that she had the severe impairments of degenerative disc disease of spine, basilar aneurysm status post coiling, headaches, affective disorder, anxiety disorder, and cognitive disorder not otherwise specified.  (*Id.*)  Despite the impairments, at step three, he found that she had no impairment or combination of impairments that met or equaled the severity of one of the impairments listed in the social security regulations.  (R. at 21.)

Next, the ALJ determined that Plaintiff had the RFC to perform light work as defined in 20

---

[8]  The five-step analysis used to determine whether a claimant is disabled under the Social Security Act is described below.

CFR 404.1567(b) and 416.967(b) in that she could lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand/walk and sit for six hours of an eight-hour workday, could perform simple, routine tasks with no more than occasional contact with the general public and coworkers, no more than occasional climbing of ramps and stairs, but no climbing of ladders, ropes, or scaffolds.  (R. at 22.)  Additionally, she must avoid exposure to hazardous moving machinery, unprotected heights, and no commercial driving.  (*Id.*)

At step four, the ALJ found that Plaintiff could not perform her past relevant work.  (R. at 27.)  The ALJ continued to step five and found that transferability of job skills was not material to the determination of disability because use of the Medical-Vocational Rules as a framework supported a finding that she was not disabled, whether or not she had transferrable job skills.  (R. at 28.)  Considering her age, education, work experience, and RFC, the ALJ found there were jobs in significant numbers in the national economy that she could perform.  (*Id.*)  Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined under the Social Security Act, from December 10, 2011, the alleged onset date, through July 25, 2014, the date of his decision.  (R. at 29.)

## II.   LEGAL STANDARDS

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g).  "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla, but it need not be a preponderance."  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting

*Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)).  In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program.  *Davis v. Heckler*, 759 F.2d 432, 435 n.1 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income.  *Id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision.  *Id.* at 436 and n.1.

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act.  *Leggett*, 67 F.3d at 563-64.  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  When a claimant's insured status has expired, the claimant "must not only prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status." *Anthony*, 954 F.2d at 295.  An "impairment which had its onset or became disabling after the special earnings test was last met cannot serve as the basis for a finding of disability." *Owens v. Heckler*,

770 F.2d 1276, 1280 (5th Cir. 1985).

The Commissioner utilizes a sequential five-step analysis to determine whether a claimant is disabled:

1.     An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.     An individual who does not have a "severe impairment" will not be found to be disabled.

3.     An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.     If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.     If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)).   Under the first four steps of the analysis, the burden lies with the claimant to prove disability.  *Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id.*  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing.  *Greenspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  After the Commissioner fulfills this burden, the burden shifts back

to the claimant to show that he or she cannot perform the alternate work. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III.  ISSUES

Plaintiff raises the following issues for review:

1.   (a) In rejecting the medical opinion of Ms. Norris's longtime treating neurologist (Dr. Martin), did the ALJ reversibly err by ignoring the six factors that ALJs must apply when weighing medical opinions?

   (b) In September 2013, Dr. Martin opined that Ms. Norris is currently disabled, would remain so for "more than 6 months," and that her disability should not be declared to beat an until such time as she is "released by a psychiatrist." Is the ALJ's sole basis for discrediting all Dr. Martin's conclusions – that he "deferred to another specialty" – "good cause" for rejecting his conclusion that she is currently disabled?

2.   (a) The regulations endorse two kinds of testing in cases of "organic mental disorders:" neuropsychological testing and intelligence testing. Given that SAHs cause significant cognitive disability in about 50% of cases, did the ALJ breach his duty to develop the evidence fully and fairly by failing to obtain either kind of testing?

   (b) The evidence that Ms. Norris suffered a subarachnoid hemorrhage (SAH) is overwhelming, but the ALJ did not find that she did. He found that she had a "basilar aneurysm status post coiling," which is an aneurysm that is successfully coiled in order to prevent rupturing. Is this finding supported by substantial evidence?

   (c) The records from Plaintiff's October 2009 hospitalization, which the Decision does not assess or mention, are rich with objective data showing that Ms. Norris's SAH caused more serious brain injury than the ALJ understood. These include imaging studies confirming cerebral edema, a known predictor of cognitive injury at disabling levels. Under the circumstances here – and given the ALJ's aggressive use of his own layman's intuition in discounting the opinions of qualified physicians - does this omission lead to the conclusion that the Decision fails to build the required "accurate and logical bridge" between the evidence and the ALJ's

18

ultimate conclusion?

(d) By manhandling the medical opinion evidence – i.e., failing to weigh the opinions of Drs. Holm and Thompson at all and rejecting the opinions of the two treating doctors (Drs. Khan and Martin) -- and assessing specific mental limitations in the RFC finding that no doctor endorses -- did the ALJ run afoul of the rule of Ripley v. Chater?

3.  Endovascular coiling fails in more than 25% of cases, leading to re-bleeding and headache, a dire medical emergency. Ms. Norris gets headaches, sometimes as many as four per week. They frighten her. The ALJ also found that she has an anxiety disorder, a depressive disorder, and a cognitive disorder, all at "severe" levels. She testified that when a headache hits, she must take a rest break of up to two hours in order to seclude herself, lie down, and take a Tramadol to ensure that it goes away as soon as possible. She testified that, if she cannot do this (or if the headache does not abate), she can become debilitated by panic. The RFC finding does not allow for unscheduled breaks. Not ever. Given the ALJ's oddly harsh position on this issue, does it warrant remand …

(a) … that the Decision does not contain any form of any of the words "break" or "seclude" or "rest" or "rest period" or "lie down," but depicts Ms. Norris's headaches as though they always abate after one to two hours due to medication alone?

(b) … that the "more detailed assessment" of mental limitations required by SSR 96-8p is missing, such that one cannot tell how, if at all, the ALJ intended to accommodate her headaches in the RFC finding?

(c) … that the ALJ failed to weigh (or mention) the medical opinion by the state-agency psychiatrist (Dr. Thompson), concluding that Ms. Norris needs to take rest periods to quell work interruptions from psychologically based symptoms?

(d) … that, despite the synergistic way that her SAH-post-coiling + headaches + mental disorders make each other worse than each would be in isolation, the ALJ failed to "specifically discuss the interaction or cumulation of all the claimant's medical problems," as required by Scott, Strickland, Loza, and a host of other cases?

(e) … that the sole paragraph the ALJ devoted to headaches "cherry picks" and misdescribes the evidence he purported to rely on, and it knocks down a "straw man" by pretending that Ms. Norris claims to

have "intractable migraines"? (She does not.)

4.    The Decision finds that Ms. Norris's capacity for standing, walking and sitting is 6 hours per day, many multiples of the "20 minutes" her primary-care doctor (Dr. Khan) has estimated. The ALJ's explanation includes the following flatly incorrect statement: "The claimant has not been referred for pain management." Does his further statement that "one might expect [pain management referral] if her condition were actually as serious as she alleges" show that his misunderstanding prejudiced Ms. Norris?

(doc. 13 at 6-8.)

## A.    Credibility[9]

Plaintiff appears to argue that the ALJ made an improper credibility determination that was not supported by substantial evidence. (*See* doc. 13 at 30-33, 38-41.)

The version of Social Security Ruling: SSR 96-7p in effect at the time of the ALJ's decision sets forth a two-step process for evaluating a claimant's subjective complaints. SSR 96-7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996).[10] First, the ALJ must consider whether the claimant had a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. *Id.* Once such an impairment is shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms to determine the extent to which they limit the individual's ability to do basic work activities. *Id.* If the claimant's statements concerning the intensity, persistence, or limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a credibility finding regarding the claimant's

---

[9]  Because it impacts Plaintiff's later issues, this issue is first.

[10]  Effective March 16, 2016, the Social Security Administration eliminated "use of the term 'credibility' from [its] sub-regulatory policy," clarifying "that subjective symptom evaluation is not an examination of an individual's character." SSR 16-3p, 2016 WL 1020935, at *1 (S.S.A. Mar. 16, 2016). When the ALJ issued the decision here, SSR 96-7p was the relevant social security ruling and specifically used the term "credibility." SSR 96-7P, 1996 WL 374186, at *7 (S.S.A. July 2, 1996). This credibility finding is properly analyzed under SSR 96-7p. *See Mayberry v. Colvin*, No. CV G-15-330, 2016 WL 7686850, at *5 (S.D. Tex. Nov. 28, 2016), *adopted by* 2017 WL 86880 (S.D. Tex. Jan. 10, 2017) (noting that "[b]ecause the text of SSR 16–3p does not indicate the SSA's intent to apply it retroactively, the Court would be disinclined to do so"); *see also Buchanan v. Berryhill*, No. 3:15-CV-3287-BH, 2017 WL 998513, at *9 n.4 (N.D. Tex. Mar. 14, 2017) (same). Even if SSR 16-3p applied retroactively, however, the outcome would not differ.

statements. *Id.*; *Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994) (citing *Scharlow v. Schweiker*, 655 F.2d 645, 648-49 (5th Cir. 1985)).

The ALJ's credibility determination must be based on consideration of the entire record, including medical signs and laboratory findings, and statements by the claimant and her treating or examining sources concerning the alleged symptoms and their effect. SSR 96-7p, 1996 WL 374186, at *2. The ALJ must also consider a non-exclusive list of seven relevant factors in assessing the credibility of a claimant's statements:

> 1. the claimant's daily activities;
>
> 2. the location, duration, frequency, and intensity of pain or other symptoms;
>
> 3. factors that precipitate and aggravate symptoms;
>
> 4. the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms;
>
> 5. treatment, other than medication, for relief of pain or other symptoms;
>
> 6. measures other than treatment the claimant uses to relieve pain or other symptoms (e.g., lying flat on his or her back);
>
> 7. and any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.

Although the ALJ must give specific reasons for his credibility determination, "neither the regulation nor interpretive case law requires that an ALJ name, enumerate, and discuss each factor in outline or other rigid, mechanical form. It suffices when the administrative decision is sufficiently specific to make clear that the regulatory factors were considered." *Prince v. Barnhart*, 418 F. Supp. 2d 863, 871 (E.D. Tex. 2005). Moreover, the Fifth Circuit has explicitly rejected the requirement that an ALJ "follow formalistic rules" when assessing a claimant's subjective complaints. *Falco,*

27 F.3d at 164.   The ALJ's evaluation of the credibility of subjective complaints is entitled to judicial deference.  *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir. 1991) (per curiam). The ALJ is in the best position to assess a claimant's credibility, since he "enjoys the benefit of perceiving first-hand the claimant at the hearing."  *Falco*, 27 F.3d at 164 n.18.

Here, ALJ acknowledged that Plaintiff's medically determinable impairments could be expected to cause *some* of her alleged symptoms, but he concluded that her testimony was not fully credible.  (R. at 25.)  He expressly noted the credibility factors listing in SSR 96-7p and addressed several of them, although not in a formalistic fashion.  (R. at 22-27.)  He discussed Plaintiff's past work, the diagnoses of her doctors and their related treatment, and the repeated diagnostic tests. (*See* R. at 25-28.)  He also noted that she had never undergone back surgery, and that it had never been assessed as warranted by any treating or examining medical source.[11]  (*Id.*)  He compared Plaintiff's testimony concerning her impairments and the impact on her ability to work to the objective medical findings, her history of medical treatment, and her activities of daily living.  (R. at 25.)

The ALJ's discussion shows that he relied primarily on the medical evidence of record to find Plaintiff not credible.  Although not in a formalistic fashion, he also considered the factors for determining credibility and adequately explained his reasons for rejecting her subjective complaints. The ALJ's decision is sufficiently specific to clearly show that the regulatory factors were considered.  *See Prince*, 418 F. Supp. 2d at 871.  Accordingly, there is substantial evidence to support his determination.  *See Falco*, 27 F.3d at 164.  Remand is not required on this issue.

---

[11]  The ALJ also noted that Plaintiff had not been referred for pain management, "which one might expect if her condition were actually as serious as she alleges."  (R. at 26.)  The Commissioner concedes that there were, in fact, references in the record to pain management treatment.  (doc. 20 at 33.)  The ALJ clearly relied on the other factors in making his credibility determination, so this error was harmless.

**B.**    **Severity**

Plaintiff contends that the ALJ erred by not including her subarachnoid hemorrhage as a severe impairment at step two.  (*See* doc. 13 at 22-24.)

At step two of the sequential evaluation process, the ALJ "must consider the medical severity of [the claimant's] impairments."  20 C.F.R. § 404.1520(a)(4)(ii),(c) (2012).  To comply with this regulation, the ALJ "must determine whether any identified impairments are 'severe' or 'not severe.'"  *Herrera v. Comm'r of Soc. Sec.*, 406 F. App'x 899, 903 (5th Cir. 2010) (per curiam). Under the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  The Fifth Circuit has held that a literal application of this regulation would be inconsistent with the Social Security Act because the regulation includes fewer conditions than indicated by the statute.  *Stone v. Heckler*, 752 F.2d 1099, 1104-05 (5th Cir. 1985). Accordingly, in the Fifth Circuit, an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work."  *Id.* at 1101.  In other words, "the claimant need only . . . make a *de minimis* showing that her impairment is severe enough to interfere with her ability to do work." *Anthony v. Sullivan*, 954 F.2d 289, 294 n.5 (5th Cir. 1992) (citation omitted).  When determining whether a claimant's impairments are severe, an ALJ is required to consider the combined effects of all physical and mental impairments regardless of whether any impairment, considered alone, would be of sufficient severity.  *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (citing 20 C.F.R. § 404.1523) (finding that an ALJ is required to consider the combined effects of all physical and mental impairments regardless of whether any impairment, considered alone, would be of sufficient

severity).  The claimant has the burden to establish that his impairments are severe.  *See Bowen v. Yukert*, 482 U.S. 137, 146 n.5 (1987).

In this case, the ALJ did not explain why he only found degenerative disc disease of spine, basilar aneurysm status post coiling, headaches, affective disorder, anxiety disorder, and cognitive disorder not otherwise specified as Plaintiff's only severe impairments at step two.  (*See* R. at 20-21.)  Plaintiff argues that her medical records "are rich with signs that her [subarachnoid hemorrhage] was of greater than average severity," and that she "is afflicted with ailments that interact with each other in pernicious ways, such that their cumulative effect is worse than one would expect by considering each separately."  (*Id.* at 22, 34.)  The Commissioner responds that the ALJ properly considered the appropriate medical evidence, found that Plaintiff had the severe impairments of degenerative disc disease of spine, basilar aneurysm status post coiling, headaches, affective disorder, anxiety disorder, and cognitive disorder not otherwise specified, and then proceeded beyond step two.  (*See* doc. 20 at 20.) She also argues that because the ALJ proceeded beyond step two, Plaintiff cannot demonstrate prejudice, even if the subarachnoid hemorrhage should have been considered as a severe impairment.  (*See id.*)

The Fifth Circuit has stated that a failure to make a severity finding at step two is not reversible error when an ALJ continues with the sequential evaluation process.  *Herrera*, 406 F. App'x at 903 (citing *Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987) (noting the ALJ's failure to make a severity finding at step two was not a basis for remand where the ALJ proceeded to later steps of the analysis); *Mays v. Bowen*, 837 F.2d 1362, 1365 (5th Cir. 1988) (per curiam) ("[I]f the ALJ proceeds past the impairment step in the sequential evaluation process the court must infer that a severe impairment was found.")).

24

Here, at step three, the ALJ considered the paragraph B criteria and affirmed his agreement with Dr. Thompson's Psychiatric Review Technique assessment.[12]  (R. at 21.)  He referred to his discussion of the medical evidence in the RFC section of the decision and proceeded beyond step two.  (R. at 21-29.)  In determining Plaintiff's RFC, the ALJ considered all of the medical evidence, including evidence related to her basilar aneurysm status post coiling and medical records from Texas Neurology, which addressed her aneurysm in detail.  (*See* R. at 22-27.)  His decision clearly notes that Plaintiff's aneurysm "ruptured" in 2009, and that she received treatment.  (*See id.*) Accordingly, even if the ALJ erred by finding that Plaintiff's only severe medical impairments were degenerative disc disease of spine, basilar aneurysm status post coiling, headaches, affective disorder, anxiety disorder, and cognitive disorder not otherwise specified, the error was harmless because he proceeded beyond step two.

## C.      <u>Treating Physician</u>[13]

Plaintiff contends that the ALJ erred by failing to give controlling weight to her treating physicians' medical opinions.  (doc. 13 at 15, 39.)

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence.  20 C.F.R. § 404.1529(b).  Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source.  *Id.* § 404.1527(c)(2).  A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant.  *Id.* §

---

[12]  The ALJ does not refer to Dr. Thompson by name, but he states his "agreement with the prior determination of the non-examining consultant of the State agency that no listing is met or equaled," which corresponds to her Psychiatric Review Technique assessment.  (*See* R. at 21, 296-308.)

[13]  Because Plaintiff's first and fourth issues address the weight given to the medical opinions of Drs. Martin and Khan, (*see* doc. 13 at 15, 38-41), they are considered together.

404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Id.* § 404.1527(c)(2). If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id.* § 404.1527(c)(1)-(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). If evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id.* A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id.* at 455-56. Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453. A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than

another" or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458.

Here the ALJ identified the following severe impairments at step two: degenerative disc disease of spine, basilar aneurysm status post coiling, headaches, affective disorder, anxiety disorder, and cognitive disorder not otherwise specified. (R. at 20.) At step three, he found that Plaintiff did not meet or medically equal Listings 12.04 or 12.06, and before reaching step four the ALJ determined Plaintiff's RFC. (*See* R. at 21-27.) In making his decision, the ALJ expressly considered the medical opinions of Drs. Martin and Khan, but found that their opinions were not substantially supported by the evidence in the record.[14] (R. at 23, 26-27.) The ALJ identified inconsistencies in their medical opinions and the record as a whole, and their lack of references to narrative treatment notes. (R. at 27.) He also faulted their reliance on subjective reports from Plaintiff, whom he found not fully credible, noting that "objective diagnostic scans and tests have revealed no acute intracranial pathology" and her brain MRI was unremarkable. (R. at 25-27.) He also noted Dr. Martin's reliance on another specialist, and faulted Dr. Khan's medical opinions because "the disabling degree of symptomatology provided in the opinion statement [was] inconsistent with [his] treatment notes" and that "[t]here [was] no reference in the narrative treatment notes to limited dexterity, limited range of motion, memory issues, or side effects from medical medications noted in the opinion." (R. at 27.) The ALJ gave their opinions "little weight." (R. at 27.)

Because the ALJ relied on competing first hand medical evidence when he declined to give

---

[14] The Commissioner does not disagree that Drs. Martin and Khan were Plaintiff's treating physicians. (*See* doc. 20 at 10-11, 32.)

their medical opinions controlling weight, his decision was based on substantial evidence, and he was not required to conduct the analysis in sections 404.1527 and 416.1927.[15] *See Belk v. Colvin*, 648 F. App'x 452, 455 (5th Cir. 2016) (per curiam) ("Conflicts of evidence are for the Commissioner to resolve; in applying the substantial evidence standard, we do not reweigh the evidence, but merely determine whether the Commissioner's decision is supported by substantial evidence.") (citing *Perez*, 415 F.3d at 461); *see, e.g., Wells v. Colvin*, No. 3:15-CV-3759-BK, 2016 WL 4920289, at *4 (N.D. Tex. Sept. 15, 2016) (affirming the ALJ's decision because "the doctor's opinion on the checklist form was inconsistent with and unsupported by the other substantial evidence of record, including [her] own treatment notes"). Remand is therefore not required on this basis.

## D. SAMC Opinions

Plaintiff contends that ALJ committed legal error when he failed to consider the mental RFC assessment of Dr. Thompson. (doc. 13 at 28-29.)

State agency medical consultants (SAMCs), such as Dr. Thompson, are considered experts in Social Security disability determination, and their opinions may be entitled to great weight if they are supported by the evidence. *Hardin v. Astrue*, No. 3:10-CV-1343-B, 2011 WL 1630902, at *7 (N.D. Tex. Mar. 31, 2011), *adopted by* 2011 WL 1633132 (N.D. Tex. Apr. 29, 2011). Although the ALJ is solely responsible for assessing the claimant's RFC, he must consider any opinion by an SAMC regarding the claimant's RFC in making this assessment. SSR 96-6p, 1996 WL 374180, at

---

[15] The Commissioner does not dispute that one of the ALJ's apparent reasons for giving the medical opinions of Dr. Khan little weight, i.e., that Plaintiff was not referred for pain management, was factually incorrect. (*See* doc. 20 at 33.) Because the ALJ appeared to rely on other reasons for giving Dr. Khan's medical opinions little weight, including "no reference to narrative treatment notes," "the disabling degree of symptomatology provided in the opinion statement [was] inconsistent with [his] treatment notes," and "[t]here [was] no reference in the narrative treatment notes to limited dexterity, limited range of motion, memory issues, or side effects from medical medications noted in the opinion," any reliance by the ALJ on the belief that Plaintiff had not been referred for pain management was harmless error.

*4 (S.S.A. July 2, 1996).  "RFC assessments by [SAMCs] . . . are to be considered and addressed in the [ALJ's] decision as medical opinions from nonexamining sources about what the individual can still do despite his or her impairment(s)" and "are to be evaluated considering all of the factors . . . for considering opinion evidence" outlined in 20 C.F.R. § 404.1527(c).  *Id.*  If the ALJ does not give controlling weight to a treating physician's opinion, he "must explain in [his] decision the weight given to the opinions of a [SAMC] . . . as the [ALJ] must do for any opinions from treating sources, nontreating sources, and other nonexamining source."  20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii); *Alejandro v. Barnhart*, 291 F. Supp. 2d 497, 515 (S.D. Tex. 2003); *see also* 20 C.F.R. § 404.1527(c) ("Unless we give a treating source's opinion controlling weight under paragraph (c)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion.").

Here, the ALJ's RFC assessment gives little weight to Drs. Martin and Khan, Plaintiff's treating physicians, (R. at 27), but his narrative discussion lacks an explanation regarding Dr. Thompson's mental RFC assessment.[16] (*See* R. at 18-29.)  Accordingly, the ALJ's failure to explain the weight given to Dr. Thompson's consultative opinions contravened 20 C.F.R. §§ 404.1527(e)(2)(ii) and 404.1527(c) and was legal error.  *See Webb v. Astrue*, No. 408-CV-747-Y, 2010 WL 1644898, at *11 (N.D. Tex. Mar. 2, 2010) (holding that "the ALJ erred by not . . . specifying the weight he assigned to each [SAMC] opinion"), *adopted by* 2010 WL 1644697 (N.D. Tex. Apr.  22, 2010).

The Commissioner argues that this error was harmless because Dr. Thompson's opinions were consistent with the ALJ's RFC assessment.  (doc. 20 at 30); *see a;sp Alejandro*, 291 F. Supp. 2d at 515 (harmless error analysis applies when an ALJ fails to explain the weight given to SAMCs).

---

[16]  The ALJ does clearly weigh the physical RFC assessment of Dr. Wright, however.  (R. at 27.)

In the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error. *Bornette*, 466 F. Supp. 2d at 816 (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).

In her mental RFC assessment, Dr. Thompson determined that Plaintiff could understand, remember, and carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in routine work setting. (R. at 320.) Although he did not expressly consider Dr. Thompson's RFC assessment in his decision, the ALJ limited Plaintiff to simple, routine tasks with no more than occasional contact with the general public and coworkers. (R. at 22.) Likewise, the ALJ's hypothetical to the VE specified that the hypothetical person had at least moderate difficulties in concentration, persistence, and pace, such that she was limited to simple, routine, repetitive tasks that were consistent with unskilled work that was learned by rote and simple instructions and simple work-related decision. (R. at 60.) The positions identified by the ALJ in his decision were unskilled, (R. at 28, 61), so Plaintiff was limited to work which needed little or no judgment to do simple duties that could be learned on the job in a short period of time, 20 C.F.R. § 404.1568(a) (defining unskilled work). The ALJ's RFC assessment was consistent with Dr. Thompson's medical opinions, even though he did not expressly consider them in his decision. The error was therefore harmless. *See also Webb*, 2010 WL 1644898, at *11 (finding harmless error when the ALJ erred by not specifying the weight he assigned to each SAMC opinion); *Harris v. Colvin*, No. 4:14-CV-00327-Y-BL, 2015 WL 5319814 (N.D. Tex. Aug. 19, 2015) (reversing because the RFC conflicted with the state agency psychiatrist's medical opinions that were not included in the decision), *adopted by* 2015 WL 5320080 (N.D. Tex. Sept. 10, 2015). Remand is therefore not required on this basis.

E.     **Duty to Develop the Record**

Plaintiff next contends that the ALJ failed to develop the record by failing to obtain neuropsychological testing for Plaintiff.  (doc. 13 at 18-19.)

An ALJ has a duty to fully and fairly develop the facts relative to a claim for benefits. *Newton*, 209 F.3d at 458 (citing *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995)).  When the ALJ fails in this duty, he does not have before him sufficient facts upon which to make an informed decision, and his decision is not supported by substantial evidence.  *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (per curiam) ("When a claimant is not represented by counsel, the ALJ owes a heightened duty to 'scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts.'"); *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984).  For this reason, a reviewing court may reverse the ALJ's decision if the claimant can show that "(1) the ALJ failed to fulfill his duty to develop the record adequately and (2) that failure prejudiced the plaintiff." *Jones v. Astrue*, 691 F.3d 730, 733 (5th Cir. 2012).

"The decision to order a consultative examination is within the ALJ's bailiwick."  *Harper v. Barnhart*, 176 F. App'x 562, 566 (5th Cir. 2006) (per curiam).  An ALJ must order a consultative evaluation, however, when it is necessary to enable the ALJ to make the disability determination. *Brock*, 84 F.3d at 728 (citing *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977) (per curiam)).  A consultative evaluation becomes "necessary" only when the claimant presents evidence sufficient to raise a suspicion concerning a non-exertional impairment.  *Jones v. Bowen*, 829 F.2d 524, 526 (5th Cir. 1987) (per curiam).  Isolated comments without further support by a claimant are insufficient to raise a suspicion of non-exertional impairment.  *See Pierre v. Sullivan*, 884 F.2d 799,

802-03 (5th Cir. 1989) (per curiam) (holding isolated comments about claimant's low intelligence insufficient to raise suspicion that claimant was mentally retarded); *Brock*, 84 F.3d at 728 (holding the claimant's references amounted to isolated comments because he did not mention non-exertional impairments in his original request for benefits, he never sought medical treatment for such impairments, and he did not mention these impairments at his hearing).   Additionally, when evidence in the record supports a conclusion that the claimant is not disabled,  a consultative exam is not necessary.  *Turner*, 563 F.2d at 671; *see Pierre*, 884 F.2d at 802 ("The decision to require such an examination is within the discretion of the ALJ.").

Plaintiff argues that the ALJ had a duty to obtain a consultative exam because (1) he found that she had a cognitive disorder not otherwise specified at the severe level, *and* (2) "we know" from a Columbia medical school study that was provided by Plaintiff with her brief to this Court that 50% of subarachnoid hemorrhage survivors remain permanently disabled because of cognitive dysfunction.  (doc. 13 at 19) (citation omitted).  She further argues that this 50% chance is "a near-probability."[17]  (*Id.*)  The Commissioner responds that the record was sufficient for the ALJ to determine whether Plaintiff was disabled, and that Plaintiff fails to show that the ALJ was under any obligation to send her for neurological testing.  (doc. 20 at 19.)

Plaintiff was represented by counsel at the hearing, so no "heightened duty to scrupulously and conscientiously explore all relevant facts" arose.  *Castillo v. Barnhart*, 325 F.3d 550, 552-53 (5th Cir. 2003) (per curiam); *see, e.g., Isbell v. Colvin*, No. 1:14-CV-006-C, 2015 WL 1208122, at *3 n.1 (N.D. Tex. Mar. 16, 2015) (noting that the ALJ did not have a heightened duty to develop the record where the claimant was represented by counsel).  Additionally, as noted, the burden lies with

---

[17] *Cf. Probability*, BLACK'S LAW DICTION (10th ed. 2014) (defining probability as "[s]omthing that is *likely*.")(emphasis added).

the claimant to prove disability. *Leggett*, 67 F.3d at 564.  Although the ALJ determined that Plaintiff had a cognitive disorder not otherwise specified at the severe level, there is no indication that the ALJ found the evidence in the record inconclusive or otherwise inadequate to render a decision. (*See* R. at 18-29.)  For example, the ALJ clearly considered the medical records from Plaintiff's consultative psychiatric examination with Dr. Holm as well as the records from Texas Neurology. (*See* R. at 24-27.)  There is also no evidence that Plaintiff raised the need for an additional consultative examination at the hearing (where she was represented by counsel) or at any time before the ALJ rendered his decision.  Accordingly, the ALJ did not have a duty to further develop the record by sending Plaintiff for neuropsychological testing, and remand is not required on this issue.[18]

## F.   **RFC**

Plaintiff contends that the ALJ's RFC assessment was not supported by substantial evidence. (doc. 13 at 25-38.)

Residual functional capacity, or RFC, is defined as the most that a person can still do despite recognized limitations.  20 C.F.R. § 404.1545(a)(1) (2003).  The RFC determination is a combined "medical assessment of an applicant's impairments with descriptions by physicians, the applicant, or others of any limitations on the applicant's ability to work."  *Hollis v. Bowen*, 837 F.2d 1378, 1386-87 (5th Cir. 1988) (per curiam). The relevant policy interpretation states:

1. Ordinarily, RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis.  A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.

2. The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of

---

[18]  Even if the ALJ should have ordered a consultative examination, Plaintiff has not shown that she was prejudiced in that the additional evidence would have been produced that might have led to a different decision.  *See Thompson v. Colvin*, No. 4:12-CV-466-Y, 2013 WL 4035229, at *6 (N.D. Tex. Aug. 8, 2013).  Any error was therefore harmless.

impairments, including the impact of any related symptoms.

SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996).  The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).

Determination of an individual's RFC should be based on all of the relevant evidence in the case record, including opinions submitted by treating physicians or other acceptable medical sources.  20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.  Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source.  20 C.F.R. § 404.1527(c)(2).  A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has or has had an ongoing treatment relationship with the claimant.  *Id.* § 404.1502.  When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight.  *Id.* § 404.1527(c)(2).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ.  *Newton*, 209 F.3d at 455.  The ALJ's RFC decision can be supported by substantial evidence even if he does not specifically discuss all the evidence that supports his decision, or all the evidence that he rejected.  *Falco*, 27 F.3d at 164.  A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record.  *Leggett*, 67 F.3d at 564.  Nevertheless, the substantial evidence review is

34

not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the [ALJ's] findings." *Id.* (citations omitted). Courts may not re-weigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the ALJ's decision. *See Johnson*, 864 F.2d at 343 (citations omitted).

### 1.    Lay Opinion

Plaintiff argues that the ALJ improperly relied on his own lay opinion to determine the effects of her mental impairments, citing *Ripley v. Chater*, 67 F.3d 552 (5th Cir. 1995). (doc. 13 at 25.)

In *Ripley*, the claimant argued that the ALJ failed to develop the record fully and fairly by finding that he could perform sedentary work even though there was no medical testimony to support that conclusion. 67 F.3d at 557. The Fifth Circuit noted that although an ALJ should usually request a medical source statement describing the types of work that the applicant was still capable of performing, the absence of such a statement did not necessarily make the record incomplete. *Id.* Rather, the court had to consider whether there was substantial evidence in the record to support the ALJ's decision. *Id.* The record contained "a vast amount of medical evidence" establishing that the claimant had a back problem, but it did not clearly establish the effect of that problem on his ability to work. *Id.* The ALJ's RFC determination was therefore not supported by substantial evidence, so the Fifth Circuit remanded the case with instructions to the ALJ to obtain

a report from a treating physician. *Id.* at 557-58. Notably, the Fifth Circuit rejected the Commissioner's argument that the medical evidence discussing the extent of the claimant's impairment substantially supported the ALJ's RFC assessment, finding that it was unable to determine the effects of the claimant's condition on his ability to work absent reports from qualified medical experts. *Id.* at 558 n.27.

The Commissioner argues that the ALJ accounted for Plaintiff's impairments that were corroborated by the medical evidence of the record and dated within the relevant time period. (doc. 20 at 26-27.) After making a credibility analysis, the ALJ considered the medical evidence and opinions of Drs. Martin, Khan, Holm,[19] and Wright. (*See* R. at 22-27.) He gave the opinions of Drs. Martin and Khan "little weight," and the opinions of Dr. Wright weight "to a degree that is only consistent to the assessed residual functional capacity in this decision."[20] (*Id.*) He also explained:

> Based upon the record in its entirety, including her allegations of anxiety and other symptomatology, the undersigned finds that the claimant has remained capable of performing unskilled work activity as long as she avoids more than occasional contact with coworkers and the general public. These functional limitations are of a degree that formally establishes the claimant's mental impairments as severe, as was considered above.

(R. at 26) (internal citation omitted). Because the RFC was based on specific medical opinions, the ALJ did not rely on his own lay opinion in violation of *Ripley*.

Even if the ALJ relied on his own lay opinion, however, any error was harmless. As noted, "[p]rocedural perfection in administrative proceedings is not required," and a court "will not vacate a judgment unless the substantial rights of a party have been affected," so Plaintiff must show she was prejudiced by the ALJ's failure to rely on medical opinion evidence in assessing her RFC. *See*

---

[19] Dr. Holm was not actually identified by name in the decision, but he was identifiable through exhibit numbers. (*See* R. at 24.)

[20] Dr. Wright was not actually identified by name in the decision, but he was identifiable through exhibit numbers. (*See* R. at 27.)

*Mays*, 837 F.2d at 1364.  To establish prejudice, Plaintiff must show that the ALJ's failure to rely on a medical opinion as to the effects her impairments had on her ability to work casts doubt onto the existence of substantial evidence supporting her disability determination.  *See McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 837 (N.D. Tex. 2008) ("Procedural errors in the disability determination process are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision.") (citing *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988) (per curiam)); *Frank*, 326 F.3d at 622 (applying harmless error analysis where the ALJ "seem[ed] to draw his own medical conclusions from some of the [medical] data, without relying on a medical expert's help").

As previously noted, the RFC was consistent with Dr. Thompson's mental RFC assessment. Additionally, in his physical RFC assessment, Dr. Wright determined that Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for a total of six hours in an eight-hour workday, sit for a total of six hours in an eight-hour workday, and push and/or pull without limitations.  (R. at 311.)  He further opined that she could occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but she could never climb ladders, ropes, or scaffolds.  (R. at 312.)  Although the ALJ did not expressly state what weight he gave to Dr. Wright's medical opinions, he limited Plaintiff to the physical restrictions identified in Dr. Wright's physical RFC assessment.  (*See* R. at 22.)  Because Plaintiff's RFC was consistent with the mental and physical RFC assessments of the SAMCs, any error was harmless.  *Cf. Laws v. Colvin*, No. 3:14-CV-3683-BH, 2016 WL 1170826, at *10 (N.D. Tex. Mar. 25, 2016) (reversing and remanding for further proceedings for lack of substantial evidence because the ALJ's failure to rely on a medical opinion in determining the plaintiff's RFC).  Accordingly, even if the ALJ relied on

his own lay opinion, remand is not required on this issue.

### 2.      Function-by-Function Assessment

Plaintiff next argues that the ALJ failed to set forth a more detailed assessment of her mental limitations as required by SSR 96-8p.  (doc. 13 at 28-30.)  She is essentially arguing that the ALJ erred by failing to perform a function-by-function analysis of her work limitations.  *See Newbauer v. Colvin*, No. 3:14-CV-3548-BH, 2016 WL 1090665, at *12 (N.D. Tex. Mar. 21, 2016).

When a claimant is found to have a mental impairment, the ALJ must determine its severity by evaluating "the degree of functional loss resulting from the impairment in four separate areas deemed essential for work."  *Boyd v. Apfel*, 239 F.3d 698, 705 (5th Cir. 2001) (citing 20 C.F.R. § 404.1520a(b)(3)).   These areas are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, and pace; and (4) episodes of decompensation.[21]  20 C.F.R. § 404.1520a(c)(3) (2011); 20 C.F.R. Pt. 404, Subpt. P. App. 1, § 12.00C.  This rating process is known as "the psychiatric review technique" or the "technique."  *Owen v. Astrue*, No. 3:10-CV-1439-BH, 2011 WL 588048, at *14 (N.D. Tex. Feb. 9, 2011).  If the mental impairment is severe but does not meet or medically equal a listed impairment, the ALJ must conduct an RFC assessment.  20 C.F.R. § 404.1520a(d)(3); *Boyd*, 239 F.3d at 705.

Before making an RFC determination, the ALJ must perform a function-by-function assessment of the claimant's capacity to perform sustained work-related physical and mental activities "based upon all of the relevant evidence" and taking into account "both exertional and nonexertional factors."  *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001) (per curiam) (citing SSR

---

[21]   These four functional areas are known as the "paragraph B criteria."  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00C.  The first three are rated on a five-point scale, as either none, mild, moderate, marked, or extreme, and the fourth is rated on a four-point scale, ranging from "none" to "four or more episodes."  *See* 20 C.F.R. § 404.1520a(c)(4) (2012).  If the first three functional areas are rated as "none" or "mild" and the fourth area is rated as "none," the impairment will generally be found not to be severe.  *Id.* § 404.1520a(d)(1).

96-8P, 1996 WL 374184, at *3-6 (S.S.A. July 2, 1996)).  "While the ALJ is not required to use the exact language from his psychiatric review technique, he must consider all of [the claimant's] limitations, including those found in the technique." *Owen*, 2011 WL 588048, at *14.  Specifically, the ALJ must itemize the "various functions contained in paragraph[ ] B" and express them "in terms of work-related mental activities." SSR 96-8P, 1996 WL 374184, at *5-6.  These activities "include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting." *Id.* at *6; *see also* 20 C.F.R. § 404.1545(c) (2012).  "[W]ithout the initial function-by-function assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work" at step four or perform other "types of work" at step five.  SSR 96-8P, 1996 WL 374184, at *3-4; *accord Myers*, 238 F.3d at 620.  Notably, even if the ALJ fails to conduct a function-by-function analysis, he satisfies this requirement if he bases his RFC assessment, at least in part, on a state medical examiner's report containing a function-by-function analysis.  *Beck v. Barnhart*, 205 F. App'x 207, 213-14 (5th Cir. 2006) (per curiam); *Onishea v. Barnhart*, 116 F. App'x 1 (5th Cir. 2004) (per curiam).

Here, before making his RFC determination, the ALJ expressly considered the paragraph B criteria and affirmed his agreement with the Psychiatric Review Technique completed by Dr. Thompson and her paragraph B assessment.[22]  (R. at 21, 296-308).  Additionally, as previously noted, it appears that the ALJ based Plaintiff's mental RFC on the mental RFC assessment completed by Dr. Thompson, who also completed the Psychiatric Review Technique for Plaintiff.

---

[22]  As previously noted, the ALJ does not refer to Dr. Thompson by name, but he appears to refer to her Psychiatric Review Technique.  (*See* R. at 21, 296-308) ("After a review of the entire record, the undersigned is in agreement with the prior determination of the non-examining consultant of the State agency that no listing is met or equaled.").

Accordingly, the ALJ conducted a function-by-function analysis, considered the paragraph B criteria, and based Plaintiff's RFC, in part, on the report of Dr. Thompson.  Remand is therefore not required on this basis.

### 3.    *Combined Effects*

Plaintiff next argues that the ALJ failed to consider the combined effects of her subarachnoid hemorrhage on her other medical impairments in making his RFC determination.  (doc. 13 at 34-35.) She argues:

> Many of us get headaches. We take a Tylenol. We carry on. But for sound medical reasons, a headache is not just a headache in her case. It is a possible early sign that she may be in mortal danger, a fear that can spiral into "profound panic" if the headache lingers or if she is not allowed to treat it in the way that she has found to be effective, which the RFC finding forbids.

(*Id.*)  Plaintiff does not identify any specific medical records or testimony that the ALJ failed to consider with this argument.  (*Id.*)  She merely disagrees with the ALJ's conclusions.

The ALJ considered the medical records related to Plaintiff's headaches and her history of a ruptured aneurysm in making his RFC determination, including her own testimony regarding the rupture of the aneurysm, her headaches, her treatment, and the relationship of the headaches to the aneurysm.  (*See* R. at 22-27.)  As noted, in applying the substantial evidence standard, a reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present.  *Greenspan*, 38 F.3d at 236.  Because the ALJ relied on medical evidence in the record in making his RFC determination and considered the combined effects of Plaintiff's medical impairments in making his narrative decision, his assessment was supported by substantial evidence.

**4.      Consideration of Evidence**

Plaintiff also generally argues that the ALJ engaged in "cherry picking" of facts to support his decision in violation of *Loza v. Apfel*, 219 F.3d 378 (5th Cir. 2000).  (doc. 13 at 35-38.)

In *Loza*, the Fifth Circuit held that an "ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position."  *Loza*, 219 F.3d at 393 (citing *Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984); *Garfield v. Schweiker*, 732 F.2d 605, 609 (7th Cir. 1984); *Green v. Shalala*, 852 F. Supp. 558, 568 (N.D. Tex. 1994); *Armstrong v. Sullivan*, 814 F. Supp. 1364, 1373 (W.D. Tex. 1993)).  Accordingly, an ALJ must address and make specific findings regarding the supporting and conflicting evidence, the weight to give that evidence, and reasons for his or her conclusions regarding the evidence. *Armstrong*, 814 F. Supp. at 1373.  There is no *general duty* of explanation or to provide rational and logical reasons for a decision, however. *Escalante v. Colvin*, No. 3:14-CV-0641-G-BH, 2015 WL 1443000, at *14 (N.D. Tex. Mar. 31, 2015) (citing cases).  The regulations require only that an ALJ consider and evaluate medical opinions. *See* 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2).  They do not require an ALJ to state the weight given to each symptom and diagnosis in the administrative record.  *See Proge v. Comm'r of Soc. Sec.*, No. 3:13-CV-310-SAA, 2014 WL 4639462, at *4 (N.D. Miss. Sept. 16, 2014) (applying 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2)).

Although Plaintiff may disagree with the ALJ's decision, the ALJ considered the medical evidence in the record, including the medical opinions of Drs. Martin and Khan and the records of Texas Neurology, when determining Plaintiff's RFC.  (*See* R. at 22-27.)  Because the ALJ relied on medical evidence in the record in making his RFC determination, his assessment was supported by substantial evidence.  *See Greenspan*, 38 F.3d at 236 (noting in applying the substantial evidence

standard, a reviewing court does not reweigh the evidence, retry the issues, or substitute its own

judgment).  Remand is therefore not required on this basis.

## IV.  CONCLUSION

The Commissioner's decision is **AFFIRMED**.

**SO ORDERED** this 22nd day of March, 2017.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

42